IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INKIT, INC.,<br><br>  Plaintiff/Counterclaim<br>  Defendant,<br><br>  v.<br><br>AIRSLATE, INC.,<br><br>  Defendant/Counterclaim<br>  Plaintiff. | Civil Action No. 23-00793-RGA |

MEMORANDUM OPINION

Gabriela Monasterio, Travis Steven Hunter, Jason James Rawnsley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Sarah Theresa Andrade, BAYARD, P.A., Wilmington, DE; Charles Brandon Browning, H. William Bloom, III, MAYNARD NEXSEN PC, Birmingham, AL,

  Attorneys for Plaintiff/Counterclaim Defendant.

Mary Claire McCudden, MARSHALL DENNEHEY, PC, Wilmington, DE; Gregor Hensrude, Petra N. Ambrose, KLINEDINST PC, Seattle, WA; Kevin Gramling, KLINEDINST PC, Irvine, CA,

  Attorneys for Defendant/Counterclaim Plaintiff.

March 26, 2025

ANDREWS, U.S. DISTRICT JUDGE:

Before me is Plaintiff Inkit's motion for summary judgment on Defendant airSlate's second amended counterclaim, and first, fourteenth, and seventeenth affirmative defenses. (D.I. 117). I have reviewed the parties' briefing. (D.I. 118, 133, 144). For the reasons set forth below, Inkit's motion for summary judgment as to Counts I and II of airSlate's second amended counterclaim is GRANTED. Inkit's motion for summary judgment as to Count III of airSlate's second amended counterclaim is DENIED. Inkit's motion for summary judgment as to airSlate's first, fourteenth, and seventeenth affirmative defenses is GRANTED.

I. BACKGROUND

Inkit filed the instant suit on July 21, 2023. (D.I. 1). After dropping its Lanham Act claim, Inkit now alleges four counts—three state law claims that are similar to various provisions of the Lanham Act, and a breach of contract claim for breach of a settlement agreement (the "Agreement"). (D.I. 2 at 13–16; *see* D.I. 194 at 3 of 25). airSlate filed an answer and counterclaims (D.I. 12), an amended answer and counterclaims (D.I. 20), and a second amended answer and counterclaims (D.I. 83). airSlate's operative answer and counterclaims assert twenty-two affirmative defenses and three counterclaims: (1) breach of the implied covenant of good faith and fair dealing; (2) reformation based on mutual or unilateral mistake; and (3) breach of contract. (D.I. 83 at 25–31).

Previously, on March 2, 2023, Inkit sued airSlate for improper use of Inkit's trademarks in advertisements. (D.I. 103-1 at 5–8); *see Inkit, Inc. v. airSlate, Inc.*, No. 23-cv-00232 (D. Del. Mar. 2, 2023), D.I. 1. The parties settled the earlier case. The Agreement states in part:

> 2.  airSlate's Obligations. In addition to transmission of the Settlement Payment, airSlate agrees to the following obligations:

(a) airSlate shall not use or publicly display or cause others to use or publicly display the Mark, in any form or manner, including without limitation in airSlate's web-based or other advertising, that infringes upon or otherwise violates Inkit's rights in the Mark; and

(b) airSlate shall not bid on the keywords that are the same as or confusingly similar to the Mark (the "Prohibited Keywords") listed on internet search engines (including without limitation Google® and Bing®) or other online platforms for a period of five (5) years from the Effective Date (the "Prohibited Bidding Period"). airSlate shall have a grace period of thirty (30) days from the Effective Date to implement any measures necessary to ensure compliance with this provision. In the event that after the conclusion of the grace period airSlate bids on the Prohibited Keywords, airSlate shall have ten (10) days from the date on which airSlate becomes aware of such a bid or is notified by Inkit of such a bid to remove any advertisements associated with such a bid. In the event that airSlate bids on the Prohibited Keywords seven (7) or more times during the Prohibited Bidding Period, airSlate shall be in material breach of this Settlement Agreement regardless of whether such advertisements are removed.

(D.I. 3 at 2–3 of 6, § 2).

    5. <u>Confidentiality</u>. This Settlement Agreement and its terms shall be kept confidential, except that the Parties may disclose the fact of this Settlement Agreement and that its terms are confidential, and may further disclose this Settlement Agreement to any governmental authorities to whom disclosure is required, to auditors, insurers, reinsurers, legal and financial advisors and accountants to the extent necessary to receive professional advice or as part of any transaction involving a Party and then, in each such case only if such persons are expressly made aware of this confidentiality provision.

(*Id.* at 3 of 6, § 5).

    6. <u>Specific Performance; Injunction</u>. Notwithstanding the Paragraphs titled "<u>Confidentiality</u>" and "<u>Dismissal and Release</u>", or as otherwise set forth herein, in the event a Party is alleged to have breached this Settlement Agreement, or if any action or proceeding relating to this Settlement Agreement is initiated, this Settlement Agreement will be admissible in any such action or proceeding.

(*Id.* at 3–4 of 6, § 6).

    8. <u>Entire Agreement; Alterations; Amendment; or Modification</u>. This Settlement Agreement constitutes the entire agreement between the Parties with respect to the resolution of the Lawsuit. . . .

(*Id.* at 3 of 6, § 8).

> 12. <u>Rules of Construction</u>. The Parties have participated jointly in the negotiation and drafting of this Settlement Agreement. In the event an ambiguity or question of intent or interpretation arises, this Settlement Agreement is to be construed as if drafted jointly by the Parties and no presumption or burden of proof is to arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Settlement Agreement.

(*Id.* at 5 of 6, § 12).

> 14. <u>Representations and Warranties</u>. The Parties (i) acknowledge that neither they nor their agents or attorneys have made any promise, representation, or warranty, whether express, implied or statutory, not confirmed in this Settlement agreement that concerns the subject matter herein in order to induce the execution of this Settlement Agreement; (ii) acknowledge they have not entered into this Settlement Agreement in reliance on any promise, representation, or warranty except as expressly set forth in this Settlement Agreement; and (iii) knowingly waive any and all claims that this Settlement Agreement, including any and all releases contained therein, was induced by any misrepresentation or non-disclosure, and knowingly waive any and all rights to rescind or avoid this Settlement Agreement based on presently existing facts, known or unknown.

(*Id.* at 5 of 6, § 14).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III. DISCUSSION[1]

#### A. Count I: Breach of Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing is "best understood as a way of implying terms" in a contract, "whether employed to analyze unanticipated developments or to fill gaps in the contract's provisions." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441

---

[1] The Agreement's choice of law provision states, "The law of the State of Delaware shall govern this Settlement Agreement, without regard to its principles of conflicts of law." (D.I. 3 at 4 of 6, § 7).

5

(Del. 2005). Delaware courts will "only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). A court may imply contract terms "to ensure the parties' 'reasonable expectations' are fulfilled," but implying absent contract terms is a "limited and extraordinary legal remedy." *Dunlap*, 878 A.2d at 442; *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (citation omitted).

The implied covenant "does not apply when the contract addresses the conduct at issue," but rather only applies "when the contract is truly silent concerning the matter at hand." *Oxbow*, 202 A.3d at 507 (cleaned up). "Even where the contract is silent, an interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when the contract could easily have been drafted to expressly provide for it." *Id.* (cleaned up). "Only when it is clear from the writing that the contracting parties 'would have agreed to proscribe the act later complained of . . . had they thought to negotiate with respect to that matter' may a party invoke the covenant's protections." *Dunlap*, 878 A.2d at 442 (alteration in original) (citation omitted). "The implied covenant of good faith and fair dealing cannot properly be applied to give [parties] contractual protections that 'they failed to secure for themselves at the bargaining table.'" *Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 816 (Del. 2013) (citation omitted).

Count I of airSlate's second amended counterclaim asserts, "The Settlement Agreement contained an implied promise on Inkit, Inc.'s part to inform airSlate that the [webpages at issue] violated Paragraph 2(a) therein, but Inkit, Inc. breached that implied promise by failing to do so." (D.I. 83 at 27 of 31 ¶ 49). airSlate argues that it communicated to Inkit that the "overarching

purpose" of the settlement agreement, for airSlate, was to "ensure it was complying with the promises it made therein" and "avoid breaching the Settlement Agreement." (D.I. 133 at 11 (quoting *Dunlap*, 878 A.2d at 442 ("[P]arties are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms.")). airSlate posits it entered into the Agreement to "ensure there would be no future claims, demands or lawsuits" and, without "an opportunity of notice and cure," airSlate did not receive this fruit of the bargain. (D.I. 83 at 25–26 of 31 ¶ 42).

While negotiating the Agreement, on March 22, 2023, William Bloom, Inkit's attorney, proposed a term requiring that airSlate "(a) cease infringing upon Inkit's trademarks, including in airSlate's advertising, and never again infringe upon Inkit's trademarks." (D.I. 133 at 5; D.I. 134-1 at 26 of 52, Ex. B). Bloom also proposed a term requiring that airSlate "(b) refrain from bidding on Inkit's trademarks or variations of those trademarks as keywords on internet search engines for ten (10) years." (*Id.*). Roman Perchyts, airSlate's in-house attorney, responded the same day: "You and I as lawyers can agree to 10 or 20 or 100 years of not advertising, but someone needs to execute on this covenant. We have a large advertising department that runs thousands if not millions of ads. To my knowledge, there is no simple technological solution that would ensure our compliance with the covenant." (*Id.* at 25–26 of 52, Ex. B). Perchyts' response included a monetary counteroffer, but did not say anything about a cure period.

After the exchange of some more e-mails, on March 24, 2023, Perchyts revised airSlate's counteroffer to include "2 years of not bidding on Inkit, <u>provided that</u> we have a 10 day grace period to remove any ads that violate the rule." (*Id.* at 24 of 52, Ex. B). Bloom responded that Inkit "appreciates the need for the cure period you describe and will accept that as part of the

7

settlement agreement." (*Id.* at 23 of 52, Ex. B). After more back and forth, Perchyts proposed that airSlate would agree to: "(a) refrain from infringing upon Inkit's trademarks, including in airSlate's advertising (no admission of prior infringement)" and "(b) refrain from bidding on Inkit's trademarks (limited to registered trademarks at the time of settlement, list to be included in the settlement agreement) as keywords on internet search engines for five (5) years (with a ten (10) day grace period to remove violative ads)." (*Id.* at 21 of 52). The parties and their attorneys then drafted and sent versions of the settlement agreement back and forth multiple times. (*Id.* at 19–21 of 52, Ex. B; *id.* at 33–52 of 52, Ex. C–E). Notably, both the initial draft (drafted by Bloom) and the final draft (incorporating edits by both parties) separated out airSlate's obligations into two separate subsections. (*Id.* at 33–37, Ex. C; *Id.* at 48–52, Ex. E). airSlate's attorney, Perchyts, acknowledged that only section 2(b) "expressly included a notice and cure period (for removal of the Google ads at issue in the First Lawsuit)." (D.I. 134 at 8 ¶ 25).

It is not "clear from the writing" that airSlate and Inkit would have agreed to include either a notice and cure provision or a duty-to-notify provision in section 2(a) "had they thought to negotiate with respect to that matter." *Dunlap*, 878 A.2d at 442. The Agreement also is not "truly silent" on the issue of a cure provision. *Oxbow*, 202 A.3d at 507. Accordingly, the implied covenant of good faith and fair dealing does not apply, and I decline to import a notice and cure provision into section 2(a).

This settlement agreement was negotiated and executed by two sophisticated parties through their attorneys. The contract itself acknowledges, "The Parties have participated jointly in the negotiation and drafting of this Settlement Agreement." (D.I. 3 at 5 of 6, § 12). Because of airSlate's automated method of generating advertisements, airSlate's attorney expressed the need for a "short cure period" to remove advertisements that "violate the rule" prohibiting

bidding on search terms. (D.I. 134-1 at 24 of 52, Ex. B). Inkit acknowledged this need "for the cure period [Perchyts] describe[d]." (*Id.* at 23 of 52, Ex. B). Subsequent proposed language includes a notice and cure period for section 2(b), but not section 2(a). If Perchyts believed that a cure provision in section 2(a) were equally vital, he could have proposed that addition during negotiations, but he did not. It is far from "clear" that the parties would have included a cure provision in section 2(a) "had they thought to negotiate with respect to that matter." *Dunlap*, 878 A.2d at 442. The canon of construction *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another) additionally counsels that section 2(a) be interpreted to lack a cure provision. *See Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 n.12 (Del. Ch. 1999) (recognizing application of the canon in the context of contract interpretation). That is, the Agreement has section 2(a) and section 2(b). One section has a cure period. The other does not. The fact that one does and one does not indicates that the parties knew what a cure period was and that the Agreement is not truly silent on whether section 2(a) should have a cure period. The Agreement indicates that it should not.

 Further, the notice and cure provision in section 2(b) relates to limits on airSlate's ability to bid on certain keywords during a period of five years. (D.I. 3 at 2–3 of 6, § 2(b)). But section 2(a) does not contain a time limitation and is much broader—it covers any infringement. As airSlate notes, the seven webpages at issue in the instant case already existed when the first lawsuit was filed. (D.I. 133 at 6). According to airSlate, Inkit performed a search for "inkit" after thirty days—the grace period for section 2(b)—and found that the seven webpages were still up. (D.I. 83 at 27 of 31 ¶ 48). Though it remains to be determined if these webpages are in fact violative of Inkit's trademark rights, airSlate could have easily performed a search itself and removed the pages. It is not reasonable for airSlate to expect Inkit to continually and forever

monitor all of airSlate's activity and provide warnings before it asserts its rights. *See Dunlap*, 878 A.2d at 442. airSlate may have entered into this agreement with noble intentions to avoid future litigation, but it is still airSlate's responsibility not to engage in infringing activity, with or without a contract clause requiring it to do so.

Inkit's motion for summary judgment regarding Count I of airSlate's second amended counterclaim is GRANTED.

### B. Count II: Reformation

A court may reform a contract based on the doctrine of unilateral mistake "where a party can 'show that it was mistaken and that the other party knew of the mistake but remained silent.'" *Scion Brekenridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 679–680 (Del. 2013) (quoting *Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151 (Del. 2002)). The doctrine of mutual mistake likewise allows for reformation when a party shows that "both parties were mistaken as to a material portion of the written agreement." *Cerberus*, 794 A.2d at 1151. "Regardless of which doctrine is used, the plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement." *Id.* at 1151–52.[2] "Reformation is not a mandate to produce a reasonable result" but rather "is based on intention." *Collins v. Burke*, 418 A.2d 999, 1002–03 (Del. 1980).

To succeed on its claim for reformation, airSlate must be able to show three things: (1) airSlate thought the Agreement contained a notice-and-cure provision that applied to section

---

[2] "[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986); *Cerberus*, 794 A.2d at 1148–49 (applying *Liberty Lobby* approach and requiring each element of a claim of reformation be proven by clear and convincing evidence).

10

2(a); (2) either that Inkit was similarly mistaken, or that Inkit knew of airSlate's mistake and remained silent; and (3) that airSlate and Inkit had specifically agreed that airSlate would be given notice and opportunity to cure violations of section 2(a). *See Cerberus*, 794 A.2d at 1152.

airSlate has not provided any evidence for the factfinder to find by clear and convincing evidence that the parties agreed that airSlate would be given notice and opportunity to cure violations of section 2(a).[3] airSlate may have wanted a general notice-and-cure provision, but that provision never appears to have made it into any of the drafts or proposed language communicated to Inkit. Parties cannot come to a "specific prior understanding that differ[s] materially from the written agreement" if that specific understanding is not communicated. *Id.* at 1152.

As Perchyts stated in his deposition, "I did not explicitly ask Michael Strapp [DLA Piper attorney] to include a specific language . . . that any violation of Inkit's Marks would have a notice and cure provision attached to it. I did not explicitly ask him to do that nor did I ever explicitly discuss notice and cure provision [for] section 2(a)." (D.I. 119-1 at 47 of 65, Ex. D). Perchyts also stated, "I understand the text of 2(a) to not have the notice and cure provision." (*Id.* at 50 of 65, Ex. D).

As discussed above, in emails to Inkit's attorney, Bloom, Perchyts offered "2 years of not bidding on Inkit, provided that we have a 10 day grace period to remove any ads that violate the rule." (D.I. 134-1 at 24 of 52, Ex. B). Bloom responded that Inkit "appreciates the need for *the*

---

[3] The Court in the Northern District of Alabama quashed airSlate's subpoena of Bloom and recently denied airSlate's motion to reconsider. *In re: Subpoena*, 24-mc-00993 (N.D. Ala. March 20, 2025), D.I. 20. airSlate's evidence of intent must come from what is already in the record. Additionally, airSlate's request for a continuance pending the outcome of that motion is moot. (D.I. 133 at 18–20).

*cure period you describe* and will accept that as part of the settlement agreement." (*Id.* at 23 of 52, Ex. B (emphasis added)). The context of Perchyt's statement in his email indicates that the cure period he requested applied to bidding on search terms. In subsequent communications between the parties and drafts of the Agreement, airSlate never requested a notice-and-cure provision in section 2(a).

To state a defense of unilateral mistake,[4] airSlate must show that Inkit knew of airSlate's mistake and remained silent. It must prove this by clear and convincing evidence. I assume (contrary to the evidence) that airSlate thought it had agreed to a cure provision for section 2(a). The evidence present in the record cannot support a conclusion that Inkit was aware of airSlate's mistake—that it would receive notice and an opportunity to cure violations of section 2(a)—and knowingly remained silent. When airSlate never so much as mentioned a cure period for section 2(a), how would Inkit know that airSlate thought section 2(a) contained a cure period. Inkit's motion for summary judgment as to Count II of airSlate's second amended counterclaim is GRANTED.

### C. Count III: Breach of Contract

To succeed on a breach of contract claim, a plaintiff must establish three elements: "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022).

---

[4] airSlate's other defense, mutual mistake, requires that "both parties [be] mistaken as to a material portion of the written agreement." *Cerberus*, 794 A.2d at 1151. It appears that, at most, only airSlate was mistaken; Inkit interpreted section 2(a) as written. I do not need to address Inkit's argument that the Agreement's anti-reliance and integration clauses mean that airSlate cannot assert justifiable reliance. (*See* D.I. 118 at 12–14; D.I. 133 at 10; D.I. 3 at 4–5 of 6, §§ 8, 12, 14).

12

The Agreement contains a confidentiality clause. (D.I. 3 at 3 of 6, § 5). airSlate's second amended counterclaim alleges Inkit breached this provision by publishing the Agreement, unsealed, on the court's docket and only redacting its own banking information. (D.I. 83 at 30 of 31 ¶ 66). Inkit did not redact the settlement amount or any provisions of the contract. (D.I. 7). Inkit argues that airSlate's claim for breach of contract fails because it only alleges speculative damages. (D.I. 118 at 18). airSlate argues that "reputational harm is a plausible damage." (D.I. 133 at 18).

On the question of reputational harm, Perchyts testified, "[I]t's bad optics to be sued twice by the same person. It might create an impression that we didn't in good faith try to actually resolve the first lawsuit or that we breached the settlement agreement, something like that." (D.I. 136-1 at 8 of 266, Ex. 1). Perchyts continued:

> [B]y making the terms of the settlement agreement public, the plaintiff exposed information that we agreed to keep confidential. So the damages would be reputational damages. . . . [F]or example, the idea of not bidding on Inkit's words is a unique thing that we, to my knowledge, hadn't agreed to do with anybody. So anyone who reads that could benefit from knowing that that's something that airSlate could agree to, as well as the fact that there's money paid. One could utilize that and think that if they file a similar lawsuit, whether it has merit or not, they might be able to get a similar result.

(*Id.* at 11 of 266, Ex. 1).

Elements (1) and (2) of breach of contract are not in dispute—both parties agree that the contract exists and that Inkit published the Agreement, largely unredacted, on a public docket. I find that airSlate has demonstrated a dispute of material fact as to damages that is sufficient to survive a motion for summary judgment. Inkit's motion for summary judgment as to Count III of airSlate's second amended counterclaim is DENIED.

### D. First, Fourteenth, and Seventeenth Affirmative Defenses

airSlate's Fourteenth Affirmative Defense states that Inkit's claims are barred based on mutual or unilateral mistake. (D.I. 83 at 13 of 31). airSlate's Seventeenth Affirmative Defense states that Inkit's claims are barred on the basis of bad faith or a violation of the covenant of good faith and fair dealing. Specifically, airSlate cites Inkit's publishing of the "confidential Settlement Agreement" and executing the Agreement "with knowledge there existed a mutual or unilateral mistake and/or scrivener's error, with the intent to profit from the mistake[.]" (*Id.*). airSlate's First Affirmative Defense states that Inkit's claims are "barred by the equitable doctrines of: unclean hands, estoppel, waiver, forfeiture, laches, acquiescence, consent, ratification, justification, trademark misuse, and/or other theories of equity . . . ." (*Id.* at 9 of 31).

airSlate's only argument in favor of these three affirmative defenses—which it characterizes as "First (mistake), Fourteenth (unilateral and mutual mistake) and Seventeenth Affirmative Defenses (good faith and fair dealing)"—is that they "survive for the very same reasons as set forth" earlier in its discussion of its counterclaims. (D.I. 133 at 18). Accordingly, airSlate's arguments are similarly unavailing here. Inkit's motion for summary judgment regarding airSlate's First, Fourteenth, and Seventeenth Affirmative Defenses is GRANTED.

### IV.  CONCLUSION

An appropriate order will issue.