# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INKIT, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 23-00793-RGA |
| AIRSLATE, INC., | |
| Defendant. | |

## TRIAL OPINION

Steven J. Fineman, Travis S. Hunter, Gabriela Z. Monasterio, Jason J. Rawnsley, RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; Sarah Theresa Andrade, BAYARD, P.A., Wilmington, DE; William Bloom, Charles Brandon Browning, MAYNARD NEXSEN PC, Birmingham, AL,

      Attorneys for Plaintiff.

Aaron E. Moore, MARSHALL DENNEHEY, PC, Wilmington, DE; Petra N. Ambrose, Gregor A. Hensrude, KLINEDINST, PC, Seattle, WA,

      Attorneys for Defendant.


September 17, 2025

ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff Inkit sued Defendant airSlate under Delaware law[1] for unfair competition, trademark infringement, deceptive trade practices, trademark dilution, and breach of contract. (D.I. 2). Defendant asserted a counterclaim for breach of contract. (D.I. 83 at 30–31 of 31, ¶¶ 63–69). I held a two-day bench trial. (D.I. 229; D.I. 230, hereinafter "Tr."). The parties have submitted post-trial briefing and proposed findings of fact. (D.I. 217, 218, 219, 220, 223, 224, 225, 226, 227, 228).

For the following reasons, I find that Plaintiff has shown breach of contract and unfair competition under Delaware common law and the DTPA. airSlate has also shown breach of contract.

## I.    BACKGROUND

Inkit is a software and service company, providing solutions for digital signature, document generation, workflows, and records management. (Tr. 17:12–14).

airSlate is also a software and service company, providing electronic document management products for functionalities including PDF filling and editing, digital signature, and workflow management. (Tr. 170:17–171:9).

On May 1, 2023, Inkit and airSlate entered into a settlement agreement resolving claims at issue in a prior lawsuit involving "unfair competition, false designation of origin and trademark infringement." (JEX-001 at 1); *see Inkit, Inc. v. airSlate, Inc.*, No. 23-cv-00232 (D. Del. May 2, 2023). Inkit sued airSlate for a second time in July 2023 for continuing violations of Inkit's trademark rights and breach of the settlement agreement. (D.I. 2).

---

[1] Plaintiff also sued under the Lanham Act but dropped its federal claim at the pre-trial conference. (D.I. 194 at 3:11–15). I elected to retain supplemental jurisdiction over the state claims. (*Id*. at 14:3–15).

This is an atypical trademark infringement case. The defendant here did not use a mark that is similar or identical to the plaintiff's mark to sell the defendant's own product. Rather, airSlate created webpage advertisements comparing airSlate's SignNow e-signature and document generation product to a product offered by some entity called "inkit (Docusign)." (JEX-071; JEX-072; JEX-073; JEX-074; JEX-075; JEX-076; JEX-077). DocuSign is another competitor in the e-signature and electronic document management field.

In the first lawsuit, Inkit sued airSlate for using Inkit's mark in Google ads, which directed users to these webpages. (*See* DEX-039 ¶¶ 14–27). Before the settlement agreement, airSlate removed the Google ads. (Tr. 288:2–9). But airSlate neglected to remove the seven landing webpages from its website, hence the second lawsuit.

## II.    DTPA AND COMMON LAW TRADEMARK INFRINGEMENT

### A.  Legal Standard

Common law "trade-mark infringement is a narrower term than unfair competition, but it is a species of it." *Coca-Cola Co. v. Nehi Corp.*, 25 A.2d 364, 369 (Del. Ch. 1942) (citing *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413 (1916)), *decree sustained*, 36 A.2d 156 (Del. 1944). The Delaware Deceptive Trade Practices Act ("DTPA") codifies Delaware's common law of unfair competition. *Young v. Joyce*, 351 A.2d 857, 859 (Del. 1975); *Draper Commc'ns, Inc. v. Delaware Valley Broads. Ltd.*, 505 A.2d 1283, 1290 (Del. Ch. 1985) ("The Deceptive Trade Practices Act, at least as to those cases involving trademarks or tradenames, codifies the common law."). The codification of the DTPA did "not affect unfair trade practices otherwise actionable at common law or under other statutes of this State." 6 Del. C. § 2532.

Violations of the DTPA and common-law trademark infringement are evaluated under generally the same standards as analogous federal Lanham Act claims. *Diamond State Door,*

*LLC v. Diamond State Pole Bldgs., LLC*, 2023 WL 3625000, at \*2 (D. Del. May 24, 2023); *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F. Supp. 2d 239, 244 n.13 (D. Del. 2004), *aff'd in part sub nom. Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463 (3d Cir. 2005); *see Taussig v. Wellington Fund, Inc.*, 313 F.2d 472, 474 n.2 (3d Cir. 1963) (noting that "Delaware courts in their search for controlling general principles of unfair competition have relied largely upon the body of law developed in federal decisions").

The elements of federal trademark infringement are: (1) Plaintiff owns the mark; (2) Plaintiff's mark is valid and legally protectable; and (3) Defendant's use of the mark is likely to create confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 279 (3d Cir. 2001).

For common law trademark infringement, Delaware courts likewise require ownership, a valid mark and a showing of likelihood of confusion. *See Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*, 2020 WL 4692287, at \*18 (Del. Ch. Aug. 13, 2020) (citing federal standard for trademark infringement in *Checkpoint*), *modified* (Del. Ch. Aug. 31, 2020) *and vacated in part on other grounds* (Del. Ch. Oct. 8, 2020); *Raborg v. Cantor Fitzgerald Fin. Corp.*, 2023 WL 5737984, at \*4 (Del. Ch. Sept. 6, 2023) ("A claim for infringement requires . . . identification of a valid and legally protected trademark"); *Draper Commc'ns*, 505 A.2d at 1289–90 (explaining "likelihood of confusion").

A defendant may violate the DTPA if its activity "[c]auses likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services" or "[c]auses likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another[.]" 6 Del. C. § 2532(a)(2)–(3).

**B. Findings of Fact**

1. Plaintiff has priority over Defendant.

2. Plaintiff has used the INKIT mark continuously since 2018.

3. Plaintiff has policed and protected the INKIT mark.

4. The INKIT mark is an inherently distinctive, suggestive mark when applied to document generation, records management, digital signature, and workflow services.

5. Plaintiff owns a valid trademark for the INKIT mark.

6. Plaintiff's mark is enforceable nationwide.

7. The INKIT mark is similar to the "inkit (Docusign)" mark on Defendant's webpages. The "degree of similarity" factor favors Plaintiff.

8. Inkit, airSlate, and DocuSign all provide similar electronic document generation, document management, and e-signature services. It was natural that Plaintiff would eventually offer its own e-signature capability under the INKIT mark. The "similarity of product" factor favors Plaintiff.

9. Both parties market their products on the internet through similar channels, but Plaintiff focuses on customers in regulated industries with security and privacy concerns. The "area and manner of concurrent use" factor slightly favors Plaintiff.

10. Business customers would likely be discerning before choosing to pay for a subscription, but the cost of both parties' services is relatively low, and both parties offer free trials. The "care likely to be exercised by consumers" factor slightly favors Plaintiff.

11. Plaintiff's mark is conceptually strong. Plaintiff has not met its burden to prove that its mark is commercially strong. The "strength of plaintiff's mark" factor is neutral.

12. There are no credible documented instances of actual confusion caused by Defendant's use, but the webpages were up for only a short period of time after the effective date of the settlement agreement. The "actual confusion" factor is neutral.

13. Defendant intended to refer to In Kit Solutions, a DocuSign reseller, not Plaintiff. Defendant's failure to take the webpages down after the settlement agreement do not indicate "intent." The "intent" factor favors Defendant.

## C. Conclusions of Law

### 1. Plaintiff's Complaint

Defendant argues that Plaintiff never pleaded a claim of common law trademark infringement. (D.I. 224 at 4–5). Count II of Plaintiff's complaint for unfair competition reads:

> Defendant, by its conduct described above, is using in commerce in Delaware a colorable imitation of Plaintiff's Mark in connection with advertising, sale, offering for sale and distribution of Defendant's signNow Services. Defendant's use of the Mark constitutes unfair competition and misappropriation of the Mark, all in violation of the law of unfair competition.

(D.I. 2 ¶ 49).

Trademark infringement is a species of unfair competition. *Coca-Cola*, 25 A.2d at 369. Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." By pleading "misappropriation of the Mark," Plaintiff sufficiently indicated that its Count II was for common law trademark infringement. Accordingly, I address those elements.

### 2. Ownership of Mark

Normally, "federal registration of a trademark is prima facie evidence of . . . the registrant's ownership of the mark[.]" *Kars 4 Kids Inc. v. America Can!*, 98 F.4th 436, 448 (3d Cir. 2024); 15 U.S.C. § 1115(a) (establishing that mark registered on the principal register "shall be admissible in evidence and shall be prima facie evidence of the . . . registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration.").

However, Plaintiff does not argue that its claims rely on its federal registrations. Plaintiff instead "seeks relief" based on its "common-law rights in the INKIT mark."[2] (D.I. 228 at 5). Therefore, Plaintiff bears the burden of proving its ownership of the valid and protectable INKIT wordmark by a preponderance of the evidence. *Moke Am. LLC v. Moke Int'l Ltd.*, 126 F.4th 263, 272 (4th Cir. 2025).

For unregistered marks, "the first party to adopt a trademark can assert ownership rights, provided it continuously uses it in commerce." *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991); *see B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138,

---

[2] As it must. Inkit pled that the services associated with its mark were "document generation services, document retention services, electronic document signature services, document management services and document security services." (D.I. 2 ¶ 8). Inkit's federal registration of the stylized mark in evidence is not for any of these services. (PEX-030; Tr. 77:1–23).

The benefits afforded to Inkit by registration, including a presumption of ownership and validity, extend only as far as the goods or services noted in its registration. *See Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1396 (3d Cir. 1985) ("We believe that [the Lanham Act's] purpose is best served by limiting the impact of a registered mark to only the specific terms of the registration so as to allow parties interested in marketing products with a new mark to rely as fully as possible on the registry."); *Applied Info. Scis. Corp. v. eBAY, Inc.*, 511 F.3d 966, 972 (9th Cir. 2007) (explaining refusal to allow reliance on federal registration as stemming from plaintiff's attempt in its pleadings to "extend its *own* use of its registered mark to goods not specified in its federal registration").

142 (2015) ("One who first uses a distinct mark in commerce thus acquires rights to that mark."). The parties do not dispute priority of use.

Plaintiff argues that it has "made continuous use of the INKIT mark" from 2018 until today. (D.I. 220 at 4). Plaintiff's CEO, Michael McCarthy, testified that Inkit has offered document generation and electronic records management services under the INKIT name since the company's inception in 2018. (Tr. 60:2–3, 62:5–20). Inkit added workflow management services in 2023 and e-signature services in 2024. (PEX-005; Tr. 18:8–16, 61:8–14; 59:25–60:11). Before 2024, Inkit allowed integration with third parties, like DocuSign, to provide e-signature capabilities to its customers. (Tr. 48:7–10). Inkit uses its mark to advertise on the internet using search engine advertisements and social media, and markets itself in blog posts, at tradeshows, and through the software repository GitHub. (Tr. 21:11–22:13).

Plaintiff points to its ownership of the "inkit.com" domain name and other domain names incorporating the INKIT mark, as well as its two federal registrations. (Tr. 24:20–26:20; PEX-030; DEX-020). Plaintiff holds a federal registration (U.S. Reg. No. 5610233) with a registration date of November 20, 2018, for a stylized mark consisting of the word "inkit" in lower case letters with a droplet over the second "i." (PEX-030). Plaintiff continues to use that stylization today and continues to provide some of the services listed in U.S. Reg. No. 5610233. (Tr. 26:22–27:4, 77:6–79:18). Plaintiff also holds a federal registration for a standard character mark "inkit." (DEX-020).

Defendant argues that Inkit has not adequately policed or protected its mark because other companies use marks that appear similar to the INKIT mark. (D.I. 223 ¶ 25; D.I. 224 at 7; DEX-015; DEX-018). Plaintiff counters that airSlate has not established the location and extent of these other companies' uses, and that Inkit protects its mark by enforcing its rights through

litigation and monitoring the internet for infringing uses. (D.I. 219 ¶ 29; D.I. 220 at 4; Tr. 67:10–13; DEX-039).

In some cases, failure to police infringement of a mark can result in abandonment of that mark if that use allows the mark to become generic and therefore unenforceable. *See Hermès Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 110 (2d Cir. 2000). Defendant does not argue that the INKIT mark has become generic due to widespread use and failure to police. It merely cites a few isolated uses of similar but distinguishable marks on various websites, at least one of which is by a company outside of the United States. Furthermore, a plaintiff's vigorous efforts to oppose infringements of its mark defeat a claim of abandonment. *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 693 (2d Cir. 1972). Inkit's CEO testified that it protects its marks by performing Google searches of the word "inkit." (Tr. 67:10–13). This case and the previous lawsuit confirm Inkit's penchant for trademark litigation. (DEX-039).

Inkit has made continuous use of the INKIT mark at least for document generation and electronic records management services since 2018. Inkit owns rights in the INKIT mark.

### 3. Validity and Legal Protectability of Mark

#### a. Inherent Distinctiveness

Plaintiff states that it is "not seeking relief based on [its] registrations" and that its federal registrations are irrelevant to the question of validity. (D.I. 228 at 5). Because Plaintiff does not rely on its registrations and asserts common law rights in its mark, Plaintiff bears the burden of proving the validity of its mark by a preponderance of the evidence. *Moke*, 126 F.4th at 272.

A trademark is valid without proof of secondary meaning if it is inherently distinctive. *Com. Nat'l Ins. Servs., Inc. v. Com. Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). Defendant contests the distinctiveness of Plaintiff's mark. (D.I. 224 at 6–11).

"Trademark law recognizes categories of marks based on their levels of inherent distinctiveness. From least to most distinctive, they are: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 478 (3d Cir. 1994) (citing *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)); *Ambient Heating & Cooling, LLC v. Shepherd*, 2017 WL 1162943, at *6 (Del. Ch. Mar. 28, 2017). "The stronger" or more distinctive "the mark, the greater protection it deserves." *Diamond State Tire, Inc. v. Diamond Town Tire Pros & Auto Care, LLC*, 2016 WL 4384304, at *3 (Del. Ch. Aug. 15, 2016).

Arbitrary or fanciful marks "neither describe nor suggest anything about a product[.]" *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000). Suggestive marks have some relation to the qualities of a product, but "require consumer 'imagination, thought, or perception' to determine what the product is." *Id.* at 221–22. Suggestive, arbitrary, and fanciful marks are "inherently distinctive" because "their intrinsic nature serves to identify a particular source of a product[.]" *Two Pesos*, 505 U.S. at 768. Descriptive marks, however, describe a product and "do not inherently identify a particular source." *Id.* at 769. Descriptive marks therefore may only be protected if they "become distinctive of the [mark owner's] goods in commerce." *Id.* (citation omitted). This acquired distinctiveness is called "secondary meaning." *Id.*

Plaintiff asserts that the INKIT mark is "fanciful," or at least "suggestive." (D.I. 220 at 6). The made-up word INKIT can be parsed in two ways, either "in kit," meaning "in a kit" or "inside of a toolkit," or "ink it," as in "ink inside of a pen." (Tr. 23:10–13). Defendant argues that the combination of "ink" and "it" do not require imagination to connect INKIT to Plaintiff's provision of electronic signature or printing services. (D.I. 224 at 8).

Whether a mark is suggestive or descriptive must be assessed in the context of the goods or services on which the mark is used. *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1201 (9th Cir. 2009). For instance, the trademark "Apple" would be descriptive of a brand of the fruit but is arbitrary when applied to computers. Plaintiff asserts the INKIT mark as used primarily in connection with digital document services. (D.I. 220 at 6–7; D.I. 2 ¶ 8). Inkit provides electronic signature services, but electronic signatures do not use ink, so INKIT is not descriptive of that service. Even as applied to physical printing and document services, because of the ambiguity created by the lack of space or capitalization in INKIT and the two possible readings of the mark, a consumer must take a leap of imagination to realize that INKIT can be separated into "ink" and "it." The border between suggestive and descriptive marks can be a "hazy" one. *See Engineered Tax Servs., Inc. v. Scarpello Consulting, Inc.*, 958 F.3d 1323, 1328 (11th Cir. 2020). But in this case, the INKIT mark falls on the "suggestive" side of the line, especially as applied to digital document services. INKIT is an inherently distinctive mark and does not require secondary meaning to be protectable. INKIT is a valid mark.

### b.  Geographical Scope of Protection

Federal registration establishes a right of priority nationwide even if a registrant has not used the mark in all fifty states. 15 U.S.C. § 1057(c). As Plaintiff does not assert its rights nationwide pursuant to federal registration, "the territorial scope" of its common law trademark rights are "coextensive only with the territory throughout which it is known and from which it has drawn its trade." *Tana v. Dantanna's*, 611 F.3d 767, 780 (11th Cir. 2010); 4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:2 (5th ed. 2025) (hereinafter MCCARTHY). "The mere fact that a website featuring a trademark can be accessed nationwide does not mean that the trademark is established in all markets. Rather, the location of actual buyers indicates the extent

of territorial penetration." *God's Era v. New Era Cap Co., Inc.*, 613 F. Supp. 3d 521, 526 n.5 (D. Mass. 2020) (citations omitted).

Plaintiff's CEO Michael McCarthy testified that its customers are located "nationwide," providing "IBO card" and "the Air Force" as example customers. (Tr. 20:25–21:4). He stated other customers were available "on the website," which is not in evidence. (Tr. 21:3). McCarthy did not provide locations for where these customers are located other than "nationwide." However, Defendant does not dispute that Plaintiff's mark has nationwide territorial penetration. Accordingly, I credit Plaintiff's CEO's testimony as to the national scope of protection for the INKIT mark.

### 4. Likelihood of Confusion

Inkit argues that the seven webpage advertisements on airSlate's website featuring "inkit (Docusign)" are likely to cause confusion because Inkit is not affiliated with Docusign. (*See* JEX-071; JEX-072; JEX-073; JEX-074; JEX-075; JEX-076; JEX-077). airSlate contends the comparisons on the webpages were not to Plaintiff, but to an Australian company named "Ink It Solutions," which is a reseller of DocuSign.

The DTPA provides that "a person engages in a deceptive trade practice when, in the course of a business . . ., that person . . .[c]auses likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another[.]" 6 Del. C. § 2532(a)(3). And the DTPA, "at least as to those cases involving trademarks or tradenames, codifies the common law." *Draper Commc'ns*, 505 A.2d at 1290.

### a. Delaware Factors and *Lapp* Factors

To prove trademark infringement, Plaintiff must show a likelihood of confusion. The Third Circuit analyzes likelihood of confusion with the so-called *Lapp* factors:

12

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). No one factor is outcome determinative. "[E]ach factor must be weighed and balanced one against the other." *Checkpoint Sys.*, 269 F.3d at 280.

When determining likelihood of confusion, Delaware courts consider similar, but fewer, factors in their analysis:

> (i) the degree of similarity between the marks, (ii) the similarity of products for which the name is used, (iii) the area and manner of concurrent use, (iv) the degree of care likely to be exercised by consumers, (v) the strength of the plaintiffs' mark, (vi) whether there has been actual confusion, and (vii) the intent of the alleged infringer to palm off his products as those of another.

*Diamond State Tire*, 2016 WL 4384304, at *3. "As in most instances where a multi-factored analysis is prescribed and then applied to a unique set of facts, some factors will be [more] informative than others." *Id*.

The parties have briefed their arguments based on the *Lapp* factors. The *Lapp* factors largely map onto these Delaware state law factors. I will focus on the arguments for the *Lapp* factors as they apply to the Delaware factors articulated in *Diamond State Tire*.

#### i.    Degree of Similarity Between the Marks

This factor maps onto *Lapp* factor (1). The mark used on airSlate's webpages is

**inkit (Docusign)** . (JEX-071–077). Inkit asserts rights in the wordmark INKIT. (*See* D.I. 220

at 4). Inkit also holds a registration for a stylized version of that wordmark in lower-case letters and a sans-serif font with a droplet over the second i, or **inkit** . (PEX-030).

"The single most important factor in determining likelihood of confusion is mark similarity." *A & H Sportswear*, 237 F.3d at 216. "Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship." *Sabinsa Corp. v. Creative Compounds, LLC*, 609 F.3d 175, 183 (3d Cir. 2010) (cleaned up). "The proper test is not a side-by-side comparison but, rather 'whether the labels create the same overall impression when viewed separately.'" *Id.* "Overall impression is created by the sight, sound, and meaning of the mark." *Id.*

Plaintiff argues that seven of Defendant's webpages displayed an identical mark, not merely a similar mark. (D.I. 220 at 5; JEX-071–JEX-077). Defendant argues that the stylized mark that Plaintiff now uses in its style guide, ◆ **INKIT** , does not look similar to the mark used on airSlate's webpages. (D.I. 224 at 12; DEX-010).

Simply comparing the wordmark, INKIT, without stylization to the mark on Defendant's webpages, the marks sound identical and are spelled the same. The mark used on Defendant's webpages is also almost identical to Plaintiff's registered stylized mark for use connected with different, but related services. (PEX-030). Plaintiff's style guide appears to have moved away from the design in the registered stylized mark, but there is no evidence in the record to indicate when this change occurred. Inkit's CEO testified that Inkit still uses, and intends to continue using, the registered, lowercase stylized mark with a droplet. (Tr. 27:1–4).

Regardless, Plaintiff asserts common law rights in a wordmark without stylization. INKIT sounds identical to "inkit" and, other than capitalization, looks similar as well, creating a similar overall impression.

14

The degree of similarity favors Plaintiff.

### ii.  Similarity of Product

*Lapp* factor (9) looks at "the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors." *A & H Sportswear*, 237 F.3d at 215.  Plaintiff distinguishes itself from competitors by focusing on privacy and security.  (Tr. 17:24–18:3).  For example, Mr. McCarthy testified he was unaware of any other competitor with Impact Level 5 security certification.  (Tr. 93:25–94:7).  However, Inkit, airSlate, and DocuSign all provide e-signature and electronic document generation and management services.  (Tr. 23:16–19, 170:15–171:9, 41:20–22).  Though Plaintiff did not begin to provide its own e-signature service until 2024, it previously allowed integration with third parties, including DocuSign, to provide that service.  (Tr. 48:7–12).

*Lapp* factor (10) looks at evidence of converging markets.  This factor is "pivotal in non-competing products cases." *Checkpoint Sys.*, 269 F.3d at 290.  As discussed above, Plaintiff, Defendant, and DocuSign already offer similar, competing products.  Though at the time the webpages were active, Inkit only offered e-signature services through integration with third parties, (Tr. 48:7–10), it was natural it would eventually offer its own electronic signature service.

Similarity of product favors Plaintiff.

### iii.  Area and Manner of Concurrent Use

This factor maps roughly onto *Lapp* factors (7) and (8).

Regarding factor (7), "the greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 288–89.  Plaintiff advertises using online marketing using, for example, Google ads, Bing ads, Facebook, X

(formerly Twitter), LinkedIn, and GitHub. (Tr. 21:11–22:7). Plaintiff also markets itself using blog posts and by attending trade shows, like Salesforce conferences. (Tr. 21:13–16, 22:8–13). Defendant markets its products by creating internet advertisements and webpages. (Tr. 96:22–97:3). As is evident from the first lawsuit, some of Defendant's advertisements are Google ads. (*See* Tr. 189:17–190:4; DEX-039).

Both parties market on the internet through similar channels. However, "it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011). This *Lapp* factor favors Plaintiff but does not carry much weight.

Regarding factor (8), "when parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." *Checkpoint Sys.*, 269 F.3d at 289. Inkit differentiates itself by focusing on privacy and security. (Tr. 17:24–18:3). Its paying customers operate in regulated industries and government. (Tr. 20:21–24). However, both parties target businesses, and both parties offer free trials. (Tr. 20:21–24; 21:17–19; 175:8–12; 230:10–24). This *Lapp* factor is neutral.

Area and manner of concurrent use slightly favors Plaintiff.

### iv. Care and Attention of Consumers

*Lapp* factor (3) "weighs against finding a likelihood of confusion when consumers exercise heightened care in evaluating the relevant products before making purchasing decisions." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 715 (3d Cir. 2004) (cleaned up). Specifically, expensive products and "sophisticated or professional purchasers" weigh against finding a likelihood of confusion. *Sabinsa*, 609 F.3d at 186. However, "where the group of

16

buyers is combination of professionals and ordinary consumers, the class as a whole is not held to the higher standard of care." *Id.*

Defendant argues that Plaintiff's customers are "sophisticated, and highly regulated entities" and that the price for Inkit's services is "relatively high." (D.I. 224 at 14). airSlate's various levels of SignNow services cost between eight and thirty dollars per user per month. (Tr. 174:5–175:12). airSlate also offers a "site license" that costs $1.50 per signature, but site licenses cannot be purchased online. (Tr. 175:11–12; 230:25–231:6). airSlate offers free trials with the option to convert to a paid subscription. (*See* Tr. 230:10–24). Plaintiff's services cost "a few hundred dollars per user per year." (Tr. 22:18–20). Plaintiff has "over 30-plus paying customers" and "over a thousand-plus that are free with the ability to convert." (Tr. 21:17–19). Inkit's paying customers operate primarily in "regulated industries" and include banks, insurance providers, healthcare providers, utility companies, and the federal government. (Tr. 20:21–24).

Both companies offer options at a relatively low-cost, even ignoring the availability of "free trials" and "free tiers." Though both parties serve primarily businesses and professionals rather than ordinary consumers (Tr. 20:21–24; 175:8–12), a customer can start by using either party's services for free and then choose to convert to a paid subscription later. As sophisticated customers, businesses and regulated entities would probably be discerning when evaluating the features of a service and choosing to pay for a subscription. Because Inkit's total sales revenue for 2023 was $673,598, but Inkit only had 22 paying customers at that time, those customers must have been buying many licenses and exercising quite a bit of care. (Tr. 91:2–7). But because the cost per license is relatively low, and because customers can try the services for free from both parties before committing, the "care and attention of consumers" factor slightly favors Plaintiff.

17

### v. Strength of Plaintiff's Mark

*Lapp* factor (2) looks at the strength of a Plaintiff's mark. Stronger marks are more likely to cause confusion. *See Versa Prods. Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 203 (3d Cir. 1995). A trademark's strength is based on the mark's conceptual distinctiveness and commercial strength. *Fisons*, 30 F.3d at 479. "The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of 'marketplace recognition.'" *A & H Sportswear*, 237 F.3d at 221.

Classification of distinctiveness is "useful" in determining conceptual strength. *Id.* at 222. The inherent distinctiveness of a mark contributes to its strength. *See Ambient Heating & Cooling*, 2017 WL 1162943, at *6. As discussed above, the INKIT mark is an inherently distinctive mark because it is suggestive when applied to electronic document generation or electronic signature services. However, though inherently distinctive, suggestive marks may still be conceptually "weak" when widely used, particularly in the same market. *A & H Sportswear*, 237 F.3d at 222–23. Classification of a mark as inherently distinctive is not dispositive to the question of conceptual strength. *Id.*

Defendant presented examples of several companies seemingly using variations on the INKIT mark to market electronic signature services. (Tr. 67:22–73:12). However, all of these companies separate "ink" and "it," whether with a hyphen, a space, a period, capitalization, or a graphical ink blot. (DEX-015). Of these companies, only Plaintiff's mark is presented as one word without an interruption or change in capitalization within the mark. Plaintiff's mark is therefore the only mark in evidence with an ambiguous pronunciation (*i.e.*, "in kit" vs. "ink it") that belies the multiple services it provides in addition to electronic signature services. The use

of similar marks in the marketplace is not sufficient to render Plaintiff's inherently distinctive mark weak. Conceptual strength favors Plaintiff.

A mark is commercially strong if it enjoys "marketplace recognition." *Fisons*, 30 F.3d at 479. "[C]ourts must look at the strength of the mark in the industry in which infringement is alleged." *Checkpoint Sys.*, 269 F.3d at 284. "The focus of the commercial strength inquiry is on consumer recognition of the mark." *GOLO, LLC v. Goli Nutrition Inc.*, 2020 WL 5203601, at *6 (D. Del. Sept. 1, 2020). Though "evidence of money spent does not automatically translate into consumer recognition," commercial strength may be measured, in part, by the extensiveness of advertising and sales. *A & H Sportswear*, 237 F.3d at 224; *Acxiom Corp. v. Axiom, Inc.*, 27 F. Supp. 2d 478, 496 (D. Del. 1998). However, evidence of money spent on advertising is insufficient alone to establish commercial strength. *GOLO*, 2020 WL 5203601, at *6.

Mr. McCarthy testified that Inkit has spent "millions of dollars" on branding and marketing since it was founded in 2018. (Tr. 22:14–17; 23:22–24). Though Mr. McCarthy testified that Inkit spent a million dollars on advertising "this year," he did not know how much it spent on advertising in 2023 (the time of alleged infringement). (Tr. 91:10–15). Inkit's total sales revenue for 2023 was $673,598. (Tr. 91:5–7). Inkit currently has approximately 30 paying customers and had 22 customers at the time of alleged infringement in 2023. (Tr. 21:17–19; 91:2–4).

Other than advertising expenses, Plaintiff has provided no other evidence of market recognition. Even crediting Plaintiff's contention that it is a major player for customers with privacy and security concerns, there is no overlap between airSlate's and Inkit's customers and airSlate does not appear to focus on serving these customers. (D.I. 224 at 14; Tr. 175:25–176:8). Inkit has not met its burden to prove the commercial strength of its mark.

As "conceptual strength" favors Plaintiff and "commercial strength" favors Defendant, strength of mark is neutral.

### vi. Evidence of Actual Confusion

*Lapp* factors (4) and (6) look at evidence of actual confusion. "[W]hile evidence of actual confusion would strengthen plaintiff's case, it is not essential." *Fisons*, 30 F.3d at 476. Mr. McCarthy testified that "somebody" called Inkit's support team and asked if Inkit was affiliated with DocuSign. He could not recall anything about the conversation, when it occurred, or whether the caller had seen or referred to the seven webpages at issue. (Tr. 45:7–46:12). There is no credible evidence that any potential customers viewed airSlate's webpages after May 1, 2023, and were confused as to the source or affiliation of the INKIT mark.

airSlate's webpages first went up on August 8, 2022. (Tr. 110:15–22). The effective date of the settlement agreement was May 1, 2023. (JEX-001). airSlate removed the webpages sometime between July 2023 and September 2023. (Tr. 227:1–4; 265:13–269:3). Defendant's webpages were up for approximately one year, and for only a few months in 2023 between the settlement agreement and when airSlate took them down. With such a short duration of availability, this factor is not probative. It is neutral.

### vii. Defendant's Intent

*Lapp* factor (5) examines defendant's intent and "indicate[s] a likelihood of confusion only if an intent to *confuse* customers is demonstrated via a purposeful manipulation of the junior mark to resemble the senior's." *A & H Sportswear*, 237 F.3d at 226 (emphasis in original).

airSlate's Chief Marketing Officer, Shawn Herring, testified that "inkit (Docusign)" in airSlate's advertisements referred to INK IT Solutions in Australia, which is a reseller of DocuSign products. (Tr. 103:14–104:7).

Plaintiff argues that INK IT Solutions is not what the webpages displayed and that "airSlate's actions were at best careless." (D.I. 220 at 10). Further, Plaintiff argues that, even if the original advertisements did not refer to Plaintiff Inkit, Inc., Defendant was on notice of potential infringement after settling the first lawsuit. (D.I. 228 at 8). Mr. Roman Perchyts, airSlate's General Counsel, testified that taking down webpages takes time and costs money, so after removing the Google ads linking to the webpages following the settlement agreement, Defendant "let [the] landing pages be." (Tr. 171:12–13; 192:4–193:22).

Plaintiff's argument does not demonstrate the type of intent "to trade on the good will and reputation" of Inkit's mark necessary to find in favor of Inkit on this factor. *Ambient Heating & Cooling*, 2017 WL 1162943, at *6. I credit Defendant's explanation for its actions. Intent favors Defendant.

### b. Weighing of the Factors

Plaintiffs have shown a likelihood of confusion. Plaintiff's INKIT mark and the mark used on Defendant's webpages are effectively identical, and similarity of the marks is "[t]he single most important factor in determining likelihood of confusion." *A & H Sportswear,* 237 F.3d at 216. Plaintiff's mark has conceptual strength, but Plaintiff did not bear its burden to demonstrate commercial strength. Though Plaintiff focuses on privacy and security, Plaintiff, Defendant, and DocuSign all provide e-signature, document generation, and document management services. Both Plaintiff and Defendant advertise and market their products on the internet using similar channels, such as Google ads. One factor favoring Defendant, "intent," is unnecessary for a finding of likelihood of confusion. *Draper Commc'ns*, 505 A.2d at 1295. Likewise, evidence of "actual confusion" is not necessary to prevail. *Id*. at 1290, 1295.

Taken together, the foregoing factors point to a conclusion that Plaintiff has shown a likelihood of confusion as to the source or affiliation of Plaintiff's INKIT mark caused by Defendant's use of "inkit (Docusign)" on its webpages.

### c. Fair Use

Defendant proposes that I find that their use of the INKIT mark was "subject to fair use." (D.I. 223 ¶ 121). Assumedly, this finding would be based on airSlate's assertion that it was referring to the Australian In Kit Solutions company—which is affiliated with DocuSign—and not Plaintiff. However, Defendant cites no Delaware law on the topic and does not argue for fair use in its brief. The failure to brief the defense is a forfeiture of the defense. In addition, as there is a likelihood of consumer confusion, I would decline to find that Defendant's use of the INKIT mark was fair use if I reached the issue.

## III. DILUTION

### A. Legal Standard

The Delaware dilution statute provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law or a trade name valid at common law, shall be a ground for injunctive relief notwithstanding the absence of competition between the parties, or the absence of confusion as to the source of goods or services.

6 Del. C. § 3313.

There are no published decisions in the Delaware state courts interpreting Delaware's dilution statute. Federal district courts in Delaware have looked to interpretations of the New York anti-dilution statute, which contains largely identical language, for guidance. *See Spark Therapeutics, Inc. v. Bluebird Bio, Inc.*, 2022 WL 605724, at *14 (D. Del. Jan. 25, 2022); *Barnes Grp. v. Connell Ltd. P'ship*, 793 F. Supp. 1277, 1303–04 (D. Del. 1992). The New York statute,

like Delaware's, "requires that plaintiff's mark possess a distinctive quality capable of dilution

and that plaintiff show a likelihood of dilution." *Barnes*, 793 F. Supp. at 1303–04 (citing *Mead*

*Data Ctr., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989)); *see*

N.Y. Gen. Bus. Law § 360-l (2024).

The Delaware statute does not define dilution. The term, however, is understood to mean

the "blurring of a mark's product identification or the tarnishment of the affirmative associations

a mark has come to convey." *Barnes*, 793 F. Supp. at 1304 (citing *Mead*, 875 F.2d at 1031); *see*

Restatement (Third) of Unfair Competition § 25 (Am. L. Inst. 1995). "Dilution by blurring

occurs when the defendant uses the plaintiff's trademark in a manner that results in lessening the

ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's product or services."

*Spark Therapeutics*, 2022 WL 605724, at *12.

Unlike the federal dilution statute, a mark need not be famous to obtain relief under the

Delaware statute. *Barnes*, 793 F. Supp. at 1304; *see* 15 U.S.C. § 1125(c). The *Barnes* court

determined, "Proof of distinctiveness necessary to satisfy the [state] antidilution statutes typically

is the same proof used to show inherent or acquired distinctiveness for infringement purposes

under the Lanham Act."[3] *Barnes*, 793 F. Supp. at 1304. However, bare mark validity is not

enough—a plaintiff must also show some "mental association" between the marks to prove

dilution. *See id.* "Mental association" is what blurs the distinctiveness of a plaintiff's mark. *Id.*

Despite the above quotation from *Barnes*, the court in *Spark Therapeutics* noted that

*Barnes* "is somewhat cryptic regarding the degree of a mark's distinctiveness that is necessary to

---

[3] *Barnes* cites *Mead* for this proposition, but *Mead* actually states: "Distinctiveness for dilution purposes has often been equated with *strength* of a mark for infringement purposes." *Mead*, 875 F.2d at 1030 (emphasis added). I note this difference because the Third Circuit looks at both inherent distinctiveness and commercial strength when determining the "strength" of a mark for "infringement purposes." There is a difference between a valid trademark and a strong one.

result in 'dilution of the distinctive quality' of the mark, which the statute requires." *Spark Therapeutics*, 2022 WL 605724, at *14.  Without argument from the parties on this issue, however, I find that Inkit's suggestive mark is sufficiently distinctive to qualify for protection under Delaware's dilution statute.

On the question of mental association between the marks, I and another court in this district previously have found the federal dilution factors helpful in assessing Delaware dilution claims.  *See S&P Glob. Inc. v. S&P Data LLC*, 619 F. Supp. 3d 445, 468 (D. Del. 2022); *Spark Therapeutics*, 2022 WL 605724, at *17; 15 U.S.C. § 1125(c)(2)(B).  In a federal dilution claim, however, the factors are only applied when the mark at issue is a famous mark.  *See* 15 U.S.C. § 1125(c)(2)(A).  Renown or market strength of the plaintiff's mark was not an issue in *S&P* because plaintiffs provided "extensive evidence" of the commercial strength, or marketplace recognition, of their mark.  *S&P*, 619 F. Supp. 3d at 457–58.  Likewise, the Plaintiff in *Spark Therapeutics* provided evidence of the commercial strength of the SPARK marks.  *Spark Therapeutics*, 2022 WL 605724, at *6.

For a mark, like Inkit's, without demonstrated fame or commercial strength, the federal dilution factors are less helpful than in previous cases.  As the New York anti-dilution statute is largely identical to Delaware's, does not require fame, and this District has historically looked to interpretations of the New York statute for guidance on dilution, I instead apply the factors used by the Second Circuit for evaluating the New York statute.

The Second Circuit uses the following six factors to determine likelihood of dilution by blurring under the New York anti-dilution statute: "(i) the similarity of marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York*

*Stock Exch., Inc. v. New York, New York Hotel LLC*, 293 F.3d 550, 558 (2d Cir. 2002)

(hereinafter "*NYSE*"); *see Mead*, 875 F.2d at 1035 (Sweet, J., concurring).

**B. Findings of Fact**

1. Plaintiff's INKIT mark is a suggestive mark and is therefore inherently distinctive, but not as strong as arbitrary or fanciful marks.

2. INKIT and inkit are similar marks, but placing "inkit" next to "(Docusign)" cuts against the similarity of the marks. The "similarity of marks" factor is neutral or slightly favors Defendant.

3. Plaintiff's, Defendant's, and Docusign's products are similar. The "similarity of products" factor favors Plaintiff.

4. The "sophistication of customers" factor favors Defendant.

5. The "predatory intent" factor favors Defendant.

6. The "renown of senior mark" factor favors Defendant.

7. DocuSign may be a renowned mark, but the allegedly diluting mark, "inkit" next to "(Docusign)," is not. The "renown of junior mark" factor favors Defendant.

**C. Conclusions of Law**

As discussed previously, Plaintiff's mark is suggestive and inherently distinctive and thus has the potential to be protectable under Delaware's anti-dilution statute. *See Barnes*, 793 F. Supp. at 1304. However, the inherent distinctiveness of Plaintiff's mark does not mean Plaintiff has established a likelihood of dilution. The question is whether Defendant's use is likely to cause "blurring," or create a mental association between Plaintiff's INKIT mark and the "inkit (Docusign)" mark used on Defendant's webpages.

When evaluating the similar New York dilution statute, the Second Circuit looks to six factors, including: "(i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *NYSE*, 293 F.3d at 558. As discussed previously for likelihood of confusion, factor (ii) favors Plaintiff and factor (iv) favors Defendant. I address factors (i), (iii), (v), and (vi) below.

### 1. Similarity of Marks

Factor (i) of the Second Circuit's test looks at the "similarity of the marks." Under New York anti-dilution law, the marks must be "substantially similar" and "the substantial similarity test requires more than the familiar test of similarity used in the traditional infringement context." *Miss Universe, L.P. v. Villegas*, 672 F. Supp. 2d 575, 595 (S.D.N.Y. 2009) (cleaned up). A mark that is similar enough to infringe may not be similar enough to dilute. *See id.* at 596 (holding that, because the "substantial similarity" required for dilution "requires more" than similarity for traditional infringement, a mark that was not similar enough to infringe was also not similar enough to dilute).

Both the similarity of the marks and context of a defendant's use of a mark matter when determining likelihood of dilution. For instance, using a different font, or displaying the mark alongside a house mark can defeat a dilution claim. *See Healthbox Glob. Partners, LLC v. Under Armour, Inc.*, 2016 WL 3919452, at *9 (D. Del. July 19, 2016) (applying Delaware dilution statute and noting different font and well-known graphical mark "render[ed] the marks at issue different"); *Hormel Foods Corp. v. Jim Henson Prods., Inc.*, 73 F.3d 497, 506 (2d Cir. 1996) (applying New York dilution statute and stating that display of character name "Spa'am" next to "Muppet Treasure Island" and the character's likeness "alone" could prevent dilution of

Hormel's "Spam"); *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 379 (D.N.J.

2002) (finding "differences" like use of "house marks 'alone' can defeat dilution claims").

Mr. Herring testified that airSlate used "(Docusign)" next to "inkit" to indicate that Inkit

Solutions was a reseller of and associated with DocuSign. (Tr. 104:3–7). Though Plaintiff

argues that Defendant's use of "inkit (DocuSign)" dilutes its mark, the use of "(Docusign)"

accompanying "inkit" may in fact clarify to viewers that *this* "inkit" is affiliated with competitor

DocuSign, and is *not* Inkit, Inc. Mr. McCarthy testified that Inkit has never used its INKIT mark

next to "DocuSign" or any other company name because it would "would mean that those two

would be equal to one another or are the same." (Tr. 30:13–25). Though "inkit" and INKIT are

clearly similar marks, airSlate's inclusion of "(Docusign)" next to "inkit" cuts against that

similarity for the purposes of likelihood of dilution. This factor is neutral or slightly favors

Defendant.

### 2.  Sophistication of Plaintiff's Customers

When a plaintiff serves "sophisticated" customers, "there is a reduced likelihood that a

junior mark will blur the senior mark's selling power." *Mead*, 875 F.2d at 1036–37 (Sweet, J.

concurring). The customers of both Inkit and airSlate are businesses. Inkit's customers are

primarily regulated entities, like "banks, insurance providers, healthcare providers, utility

companies" and the federal government. (Tr. 20:21–24). Plaintiff's customers are highly

sophisticated. This factor favors Defendant.

### 3.  Renown

Factors (v) and (vi) of the Second Circuit test look at renown of the senior mark and

renown of the junior mark.

27

As the owner of the senior mark, "a plaintiff must possess an extremely strong mark capable of dilution to prevail" under the New York anti-dilution statute. *Mead*, 875 F.2d at 1038 (Sweet, J., concurring). "A court evaluates a mark's strength with reference to the distinctive quality of the mark or its secondary meaning, not its 'fame.'" *Id.* Instead of "fame," the renown of a mark turns on "selling power." *Roadway Express, Inc. v. Roadway Motor Plazas, Inc.*, 1990 WL 120945, at *5 (N.D.N.Y. Aug. 16, 1990). A mark can be protectable from dilution without being nationally famous, but "the extent to which the senior mark is famous or nationally renowned affects the mental associations consumers make between the two marks, which in turn bears upon the likelihood of blurring." *Mead*, 875 F.2d at 1038. Plaintiffs without a famous mark must rely more strongly on the other factors to establish a likelihood of dilution by blurring. *See id.*

Renown of the junior mark weighs in a plaintiff's favor if a junior mark becomes so famous that it threatens to "overwhelm" the senior mark. *Id.* However, when the marks are "not substantially similar, let alone identical, the concept of a 'junior user' makes little sense and lacks relevance to the issue of dilution by blurring." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 452 n.210 (S.D.N.Y. 2004), *order aff'd in part, vacated in part on other grounds*, 454 F.3d 108 (2d Cir. 2006).

Because "renown" turns on the "selling power" of a mark, the inquiry is similar to the Third Circuit's evaluation of a mark's commercial strength under *Lapp* factor (2). To assess renown, courts look at evidence such as the length of time a party has used the mark, money spent on advertising, evidence of public awareness of the mark, and media coverage. *See, e.g.*, *Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. B.E. Windows Corp.*, 937 F. Supp. 204, 214 (S.D.N.Y. 1996); *Roadway Express*, 1990 WL 120945, at *5.

28

Inkit began operations in 2018 and had only been in operation for five years in 2023. (Tr. 17:22–23). Though Mr. McCarthy testified that Inkit has spent "millions of dollars" on branding and marketing (Tr. 22:14–17; 23:22–24), Inkit has not demonstrated how much it spent on advertising at the time of infringement in 2023. (Tr. 91:10–15). Inkit currently only has approximately 30 paying customers and had 22 paying customers in 2023. (Tr. 21:17–19; 91:2–4). Other than its own press release (PEX-005; Tr. 18:13–14), Inkit provides no other evidence of media coverage or public awareness of its mark, whether in regulated industries or otherwise. Factor (v), "renown of senior mark," favors Defendant.

Factor (vi), "renown of junior mark," is not helpful in this case. DocuSign appears to be a more well-known mark than INKIT. (*See* Tr. 63:13–18). But as dilution requires the comparison between substantially similar marks, the comparison must be between INKIT and "inkit" next to "(Docusign)." There is no evidence in the record of the renown or commercial strength of "inkit (Docusign)." Factor (vi) favors Defendant.

### 4. Weighing of the Factors

Neither the New York nor the Delaware anti-dilution statute requires that a mark be famous to be diluted. However, dilution, or mental association, is not likely to occur if potential customers are not at least aware of the senior mark. Four out of six of the Second Circuit's factors favor Defendant, one slightly favors Defendant or is neutral, and one favors Plaintiff.

The products of Plaintiff, Defendant, and DocuSign are all similar. But airSlate did not intend to dilute Inkit's mark. And Inkit's customers are highly sophisticated, making dilution less likely. In addition to these factors, because the presence of "(Docusign)" cuts against the similarity of the two marks, and because Plaintiff has not demonstrated renown or commercial

strength in its INKIT mark, I find that Inkit has not established a likelihood of dilution under 6 Del. C. § 3313.

## IV.    BREACH OF CONTRACT

### A. Legal Standard

Under Delaware law, the elements of a breach of contract claim are: "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *Geico Gen. Ins. Co. v. Green*, 308 A.3d 132, 140 (Del. 2022).

### B. Findings of Fact – Inkit's Claim

1. airSlate does not dispute that the Settlement Agreement is an enforceable contract and itself asserts rights under the contract in its counterclaim.

2. Under Section 3, airSlate's scope of release under the Settlement Agreement was limited to "claims, demands, actions, and causes of action set forth in the [first lawsuit]" and the release explicitly did not "include breach of [the] Settlement Agreement or any infringement of the Mark by airSlate after the Effective Date."

3. The effective date of the Settlement Agreement was May 1, 2023.

4. airSlate did not take down its webpages featuring "inkit (Docusign)" until sometime between July 2023 and September 2023.

5. airSlate violated Section 2(a) when it publicly displayed Inkit's mark on its webpages in a manner that infringed upon Inkit's trademark rights under 6 Del. C. § 2532 and Delaware common law.

6.  Inkit suffered harm caused by airSlate's infringement of Inkit's trademark, which was also a violation of the Settlement Agreement.

7.  Under Section 6, the parties agreed that "irreparable damage would occur in the event that this Settlement Agreement is not timely performed in accordance with its specific terms or is otherwise breached" and waived the requirement to prove damages in connection with a breach of contract action.

## C. Conclusions of Law – Inkit's Claim

airSlate argues that Inkit has not proved breach of contract because Inkit did not present "any evidence of contractual damages, nominal or otherwise." (D.I. 224 at 21).

Inkit argues that airSlate's trademark infringement harmed Inkit. (D.I. 220 at 16). Inkit argues that the damages element of breach of contract has also been met through the inclusion of Section 6 of the Settlement Agreement. (*Id.*). That section reads in part:

> …The Parties agree that irreparable damage would occur in the event that this Settlement Agreement is not timely performed in accordance with its specific terms or is otherwise breached, and that no adequate remedy at law exists in the event of non-performance or breach hereof. It is accordingly agreed that the Parties, or any of them, are entitled to seek an injunction or injunctions to prevent breaches of this Settlement Agreement and to enforce specifically the terms and provisions of this Settlement Agreement, this being in addition to any other remedy to which they are entitled at law or in equity, and the Parties hereby agree to waive any requirements for posting a bond [or] other undertaking of proving damages in connection with any such action.

(JEX-001, § 6).

Breach of contract itself gives rise to a cause of action because an "unexcused failure to perform a contract is a legal wrong." *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022). The "damages" element of contract breach under Delaware law might better be stated: "a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance." *AB Stable VIII LLC v. Maps Hotels & Resorts One*

*LLC*, 2020 WL 7024929, at \*47 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021). Money damages is one form of possible relief, but a plaintiff may, if warranted, also obtain equitable relief from a court for breach of contract. *Garfield*, 277 A.3d at 328.

If Inkit were seeking expectation damages for airSlate's breach of contract, "expectation damages must be proven with reasonable certainty, and no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 (Del. 2015). However, Inkit does not seek expectation damages.[4] (D.I. 220 at 21 ("A permanent injunction is a remedy for each of Inkit's causes of action."); D.I. 185 at 2, 11(stating that Inkit seeks nominal damages, disgorgement, and injunctive relief in the proposed pre-trial order)). Inkit has proven that airSlate violated Inkit's rights in its INKIT trademark. This is sufficient to establish the "damages" or "causally related injury" element of the contract breach cause of action based on Section 2(a) of the Settlement Agreement.

### D. Findings of Fact – airSlate's Counterclaim

1. Inkit does not dispute that there is an enforceable contract.

2. Under Section 5, the parties agreed that the terms of the Settlement Agreement be kept confidential.

3. Under Section 6, the parties agreed that the Settlement Agreement be admissible in an action for breach of contract.

4. Inkit filed a "redacted version" of sealed Exhibit A to its complaint, but only redacted Inkit's own banking information. (D.I. 7).

---

[4] Inkit does seek contractual attorneys' fees, however. (D.I. 220 at 16 n.5; JEX-001 § 7).

5. The dollar amount that airSlate paid Inkit to settle the previous lawsuit was a confidential term that Inkit was obligated to redact in its public filing.

### E. Conclusions of Law – airSlate's Counterclaim

airSlate argues that it "lost the benefit of its bargain of entering into a Settlement Agreement with a confidentiality provision." (D.I. 217 at 4). airSlate argues that Inkit's public disclosure of the amount airSlate paid has diminished airSlate's position in negotiations with other companies complaining about airSlate's web content. (*See id.* at 4–5). Mr. Perchyts testified that the Settlement Agreement being a public record will "incentivize people to bring their concerns about infringement whether they have bearing or not and [airSlate] will have less leverage in communication with them because they know we have paid other people." (Tr. 203:2–7).

Inkit argues that airSlate has not met the "damages" element of contract breach because that element requires a "causally related injury that warrants a remedy." (D.I. 226 at 5 (citing *AB Stable*, 2020 WL 7024929, at *47)). Inkit argues that airSlate only offered arguments of speculative future harm and "was not able to identify any actual harm that it suffered" during the two years since the instant lawsuit was filed. (*Id.* at 4, 5). Mr. Perchyts did not recall or did not know whether anyone other than airSlate's or Inkit's attorneys had ever seen the publicly filed Settlement Agreement. (Tr. 285:14–287:8).

As stated above, "unexcused failure to perform a contract is a legal wrong." *Garfield*, 277 A.3d at 328. "Even where actual damages cannot be demonstrated, the breach of a contractual obligation often warrants an allowance of nominal damages . . . in recognition of a technical injury and by way of declaring the rights of the plaintiff." *Penn Mart Supermarkets, Inc. v. New Castle Shopping LLC*, 2005 WL 3502054, at *15 (Del. Ch. Dec. 15, 2005) (cleaned up).

33

airSlate paid a certain sum in return for a promise that that settlement amount and the other terms of the contract would remain confidential.  (JEX-001 §§ 1, 5).  Section 6 of the Settlement Agreement allows the Settlement Agreement to be admissible in an action for breach of contract but does not relieve the parties of their confidentiality obligations.  (JEX-001 § 6).  After I granted Inkit's motion to file the Settlement Agreement under seal (D.I. 6), Inkit publicly filed an identical version of the Settlement Agreement without redacting the settlement amount.  (D.I. 7).  While I am generally loath to encourage parties' excessive redactions, the amount paid in a confidential settlement agreement should not have been filed on a public docket.  The harm airSlate argues is sufficient to satisfy the damages element of breach of contract.

I find that Inkit breached the Settlement Agreement by filing the document on a public docket without redacting the settlement amount.

## V.    RELIEF

### A. Disgorgement

Inkit seeks disgorgement of airSlate's SignNow profits from May 1, 2023 to July 31, 2023 as a remedy for common-law trademark infringement.  (D.I. 220 at 17).

Disgorgement, or "an accounting," of a defendant's profits is available as a remedy for common law trademark infringement under Delaware law.  *See, e.g.*, *Coca*-Cola, 25 A.2d at 367.  Disgorgement is an equitable remedy for trademark infringement and is "subject to a balancing of the relative equities of the plaintiff, the defendant, and the public."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 37 cmt. f (AM. L. INST. 1995).  "The common law rules governing the remedy of an accounting are analogous to those applicable under the Lanham Act."  *Id.* § 37 cmt. a.

34

Disgorgement of a defendant's profits "does not follow as a matter of course upon the mere showing of infringement. It will be denied where an injunction satisfies the equities of a case[.]" *A & H Sportswear*, 166 F.3d at 209. In the Lanham Act context, the Third Circuit weighs six non-exclusive factors when deciding whether the equities of a case support disgorgement. These factors are: "(1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 175 (3d Cir. 2005).

### 1. Intent to confuse or deceive

airSlate had no intent to confuse or deceive. airSlate claims it intended to refer to a different company, Ink It Solutions, in its advertisements. (Tr. 103:25–104:7). After the first lawsuit, airSlate removed the Google ads that directed to the infringing webpages in accordance with the Settlement Agreement. (*See* Tr. 116:20–21). But airSlate did not take down the webpages. Mr. Perchyts testified that airSlate did not do so because it takes time and costs money to take webpages down and airSlate did not believe the webpages themselves were infringing. (*See* Tr. 193:6–22). Once Inkit raised its objections to the webpages in this lawsuit, airSlate promptly and voluntarily removed the webpages in July 2023, did not republish them, and does not have any intention of republishing them. (Tr. 227:1–10). Inkit has not proven airSlate intended to confuse or deceive through its use of "inkit (Docusign)." This factor favors Defendant.

### 2. Diverted Sales

DEX-005 is a Google Analytics spreadsheet purporting to show all views of the webpages at issue, whether through advertisements, web searches, or entering the URL directly. (Tr. 228:10–229:1). The spreadsheet "reflects all views of all seven web pages during the time that they were live and active[.]" (Tr. 229:2–4). Adding up the numbers in the views column, all seven of these websites were viewed a total of 303 times. (DEX-005).

The spreadsheet further shows that zero "conversions" resulted from the webpages at issue. (*Id.*). A conversion results when a webpage user either initiates a free trial or proceeds to purchase a subscription by clicking a link on the webpage. (Tr. 230:14–24; 107:25–108:12). Mr. Perchyts testified that, accordingly, airSlate generated $0 in revenue from the infringing webpages. (Tr. 232:25–233:3; DEX-005).

Inkit's expert, Mr. Newman, testified that a user could sign up for airSlate's services in ways other than clicking a link on one of the webpages. (Tr. 142:1–3). He included all of airSlate's SignNow sales in his calculations because customers who purchased from airSlate with the help of a salesperson theoretically "could still have [utilized] the website and still have purchased software while being confused at the same time knowing who they were dealing with." (Tr. 133:2–133:7). Mr. Perchyts agreed that a customer who went through a salesperson to make a purchase after viewing the webpage would not show up as a conversion. (Tr. 248:16–20).

There is no evidence in the record, however, that any customer viewed the webpages, thought about purchasing, did not click anything, and then later called up airSlate to buy a subscription. Furthermore, the infringement at issue here occurred during the brief period after

the Google ads had been removed, but the webpages remained accessible buried somewhere on airSlate's website.

In any event, there is little to no evidence of diverted sales caused by airSlate's infringing webpages during the time after the Effective Date of the settlement agreement and the time the pages were taken down. Inkit does not dispute that "the record does not allow a determination of whether sales were diverted[.]" (D.I. 220 at 17). This factor favors Defendant.

### 3. Adequacy of other remedies

Three rationales may support disgorgement as a remedy: "(1) as a measure of plaintiff's damages; (2) if the infringer is unjustly enriched; or (3) if necessary to deter a willful infringer from doing so again." MCCARTHY § 30.59; *see Banjo Buddies*, 399 F.3d at 178. Inkit does not argue that it sustained damages due to airSlate's infringement. As previously discussed, airSlate does not appear to have profited from its infringement. Deterrence is also unnecessary—airSlate did not willfully infringe, has removed the webpages, and has no intention of publishing them again. (Tr. 227:1–10).

Though I do not find that a permanent injunction is an appropriate remedy either, this factor does not weigh in favor of granting Inkit disgorgement of airSlate's profits. This factor is neutral.

### 4. Delay by Inkit in asserting its rights

Inkit brought this suit promptly after learning that the webpages remained live despite the Settlement Agreement. (*See Tr.* 38:7–12, 201:4–6; D.I. 2). There is no evidence that Inkit delayed in asserting its rights. This factor favors Plaintiff.

### 5. Public interest in making infringement unprofitable

Inkit argues that "airSlate's conduct led Inkit to file two lawsuits within six months, and it is in the public interest to have accurate information regarding the source of goods and services." (D.I. 220 at 18).

It is true that there is a public interest in the "right of the public not to be deceived or confused." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990). However, while there is "great public interest in making misconduct unprofitable where there is culpable conduct on the part of the infringer . . .[,] [i]t is less obvious what the level of public interest is in making misconduct unprofitable for an infringer who did not have such culpable intent." *Sabinsa Corp. v. Creative Compounds, LLC*, 2011 WL 3236096, at *6 (D.N.J. July 27, 2011). airSlate's conduct was neither willfully confusing to the public nor profitable. This factor favors Defendant.

### 6. Palming off

This is not a case of palming off.

### 7. Weighing the Equities

The only factor in Inkit's favor is that it did not delay in asserting its rights. airSlate's infringement was neither willful nor profitable. The equities weigh against a remedy of disgorgement.

### B. Permanent Injunction

Inkit seeks a permanent injunction for each of its causes of action. (D.I. 220 at 21). "The law of trademark protects trademark owners in the exclusive use of their marks when use by another would be likely to cause confusion." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 131 (3d Cir. 2004) (citing *Lapp*, 721 F. 2d at 462). "A permanent

injunction is the usual and normal remedy once trademark infringement has been found in a final

judgment." McCarthy § 30.1.

A grant of an injunction is not automatic, however. To receive a permanent injunction

under Delaware law, Inkit must show "(i) actual success on the merits; (ii) that it would suffer

irreparable harm if the injunction is not granted; and (iii) that the balance of equities favors it."

*In re COVID-Related Restrictions on Religious Servs.*, 326 A.3d 626, 640 (Del. 2024).[5]

Inkit established actual success on the merits for its common law unfair competition

claim, its DTPA claim, and its breach of contract claim.

### 1. Irreparable harm

"A claim for injunctive relief must be supported by the allegation of facts that create a

reasonable apprehension of a future wrong." *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865,

at *10 (Del. Ch. Jan. 20, 2009) (cleaned up).

---

[5] Though federal law governs preliminary injunctions, whether the standard for granting a permanent injunction is substantive or procedural is unsettled, even among district courts in the Third Circuit. *See O'Hara v. Premcor Refining Grp, Inc.*, 2011 WL 337951, at *4 n.4 (D. Del Jan. 28, 2011); *compare PPG Indus., Inc. v. Jiangsu Tie Mao Glass Co.*, 2020 WL 1526940, at *22 (W.D. Pa. Mar. 31, 2020) ("The trendlines . . . point to permanent injunctions being substantive law, therefore governed by state law" and the *eBay* "general federal standard is not binding"), *with Marcum v. Columbia Gas Transmission, LLC*, 2022 WL 19404192, *1 n.1 (E.D. Pa. July 21, 2022) ("Because 'the standard for a preliminary injunction is essentially the same as for a permanent injunction . . .', it is likely that federal law would apply in the case of permanent injunctions as well. . . . Because the rule governing injunctions is procedural, rather than substantive, the federal standard would apply even where 'the right upon which this cause of action is based in state-created.'").
    The *Erie* question is made simpler in cases like this one in which a state statute establishes the right to an injunction. *PPG Indus.*, 2020 WL 1526940, at *23; *see* 6 Del. C. § 2533(a). I apply Delaware's standard but note that the result would be the same under federal law because the *eBay* standard is "essentially the same" as Delaware's. *O'Hara*, 2011 WL 337951 at *4 n.4; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (establishing four-factor test for granting a permanent injunction).

Inkit cites the provision in the Settlement Agreement in which the parties agreed that "irreparable damage would occur in the event that this Settlement Agreement is not timely performed in accordance with its specific terms or is otherwise breached, and that no adequate remedy at law exists in the event of non-performance or breach hereof." (D.I. 220 at 23; JEX-001, § 6).

The court "may rely upon enforceable contractual affirmations of the existence of [irreparable] harm." *Revolution Retail Sys., LLC v. Sentinel Techs., Inc.*, 2015 WL 6611601, at *22 (Del. Ch. Oct. 30, 2015), *order clarified*, 2015 WL 6776198 (Del. Ch. Nov. 5, 2015). However, I am not required to do so if I do not find that a risk of irreparable harm exists.

Inkit also argues that it has suffered harm to its goodwill because of airSlate's infringement. (D.I. 220 at 22–23). However, past harm does not necessarily foretell a risk of future irreparable harm that would result if an injunction is not granted.

airSlate removed the Google Ads that directed to the webpages pursuant to the Settlement Agreement. airSlate's fatal error was that it neglected to remove the disembodied webpages at issue in this case from its website. However, after being alerted to the continued existence of the webpages through Inkit's filing of this lawsuit, airSlate removed the webpages[6] and has not put them (or anything else about which Inkit has complained) back up. Mr. Perchyts instructed airSlate's marketing team to refrain from referring to Inkit on any future airSlate website "out of [an] abundance of caution." (Tr. 270:11–17).

In order to "illustrate[] the risk Inkit faces from airSlate's haphazard marketing practices," (D.I. 220 at 24), Inkit attempted a "gotcha" moment at trial by bringing up a webpage

---

[6] I suspect if Inkit had simply communicated with airSlate about the seven webpages before Inkit filed suit, airSlate would have taken them down and both parties could have saved a lot of time and money.

featuring the words "Ink It" that was still live on airSlate's website. (Tr. 270:1–3; 273:4–7). However, this is immaterial— airSlate's webpages infringed because Inkit's trademark was used alongside "(Docusign)." It is not infringement, nor is it breach of contract, to refer to either "In Kit" or even "Inkit" as a competitor in a legitimate comparative advertisement that does not create confusion as to source or affiliation.

airSlate argues that Inkit has not even suffered past harm, pointing to Mr. McCarthy's testimony that its revenues have increased substantially over the past year and that the company is "doing well." (D.I. 224 at 21; Tr. 92:4–11).

I am not convinced that Inkit has proven facts that create a "reasonable apprehension of a future wrong." *Agilent Techs.*, 2009 WL 119865, at *10. This factor favors Defendant.

### 2. Balance of Equities

If I do not issue an injunction, Inkit argues that it is at risk of future infringement because "airSlate lacks any rigorous process to determine if its uses of others' marks are even infringing." (D.I. 220 at 23–24). Inkit further argues that airSlate's "repeated" breaches after the Settlement Agreement justify a permanent injunction. (*Id.* at 24). Inkit argues that airSlate would suffer minimal hardship from the issuance of an injunction because it has already taken down the webpages. (*Id.* at 23). airSlate argues that it removed the webpages in good faith upon being alerted to Inkit's claim that airSlate was infringing, and that there is no public interest in granting a permanent injunction when there is nothing left to enjoin. (D.I. 224 at 21).

Though it would be no great hardship for airSlate to refrain from doing something it is no longer doing, has taken steps to avoid doing, and has no plans to do in the future, that is not enough to entitle Inkit to a permanent injunction. The balance of equities is neutral.

I find that Inkit has not proven its entitlement to a permanent injunction.

### C. Contract Damages

#### 1. Legal Standard

"[E]xpectation damages must be proven with reasonable certainty, and no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural, or speculative." *Siga Techs.*, 132 A.3d at 1131 (quotations omitted). "[A] court can vindicate a breach of contract through an award of nominal damages." *Cygnus Opportunity Fund, LLC v. Washington Prime Grp., LLC*, 302 A.3d 430, 454 (Del. Ch. 2023) (citation omitted).

#### 2. Inkit's Claim

Inkit does not seek expectation damages for its breach of contract claim. As I find airSlate breached the Settlement Agreement, but do not find that Inkit is entitled to the injunction it requests, I find that Inkit is entitled to $1 in nominal damages. Inkit may also recover costs, attorneys' fees, and expenses incurred pursuant to Section 7 of the Settlement Agreement. (JEX-001 § 7).

#### 3. airSlate's Counterclaim

airSlate seeks expectation damages, or in the alternative, nominal damages.

Mr. Perchyts testified that airSlate is approached by approximately five competitors per year seeking to stop airSlate from referring to them in advertisements. Over three years, that adds up to fifteen. He assumed that five of those competitors would be aware of the Settlement Agreement, and that two would request airSlate make a $15,000 settlement payment. (Tr. 205:8–206:1). In addition to that $30,000, Mr Perchyts testified he would expect a cost of $35,000 for each competitor to accomplish "continued nonadvertising." (Tr. 208:4–8). In total, Mr. Perchyts estimated expectation damages to be $100,000. (Tr. 208:4).

No other testimony or documentary evidence was introduced in support of Mr. Perchyts' back-of-napkin calculations. Prior to testifying, Mr. Perchyts did not produce any document on damages reflecting this estimate. (Tr. 297:17–21). Plaintiff on cross examination elicited the following:

> Q: So you came up with the calculation after [your] deposition; right?
> A: Yes.
> Q: Did you write it down?
> A: No.
> Q: So you just thought really hard in your mind and you came up with some damages you thought you'd ask the Court for; is that fair?
> A: Yes, I thought in my head.

(Tr. 296:24–297:7).

Mr. Perchyts' damages calculation is entirely speculative. airSlate is not entitled to expectation damages.

As I find airSlate breached the Settlement Agreement, but do not find that it is entitled to expectation damages, I find that it is entitled to $1 in nominal damages. airSlate may also recover costs, attorneys' fees, and expenses incurred pursuant to Section 7 of the Settlement Agreement. (JEX-001 § 7).

**VI.    CONCLUSION**

For the foregoing reasons, I find that Inkit has proven likelihood of confusion by a preponderance of the evidence. Accordingly, Inkit has proven a violation of its trademark rights under Delaware common law and the DTPA.

Inkit has not proven likelihood of dilution by a preponderance of the evidence.

Inkit is not entitled to disgorgement of airSlate's profits.

Inkit is not entitled to a permanent injunction.

43

Because a finding of likelihood of confusion is an infringement of Inkit's trademark rights in the INKIT mark under Delaware common law and the DTPA, Inkit has proven contract breach pursuant to section 2(a) of the Settlement Agreement. (JEX-001 § 2(a)). Inkit is entitled to $1 in nominal damages and attorneys' fees, costs, and expenses under Section 7 of the Settlement Agreement.

airSlate has proven breach of contract pursuant to Section 5 of the Settlement Agreement. airSlate is entitled to $1 in nominal damages and attorneys' fees, costs, and expenses under Section 7 of the Settlement Agreement.

The parties shall submit a final judgment consistent with this memorandum opinion within one week.